1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PENNY BENDER,

          Plaintiff,

  v.

HARTFORD LIFE INSURANCE COMPANY,
as Administrator and Fiduciary of the
Bertelsmann, Inc., Employee Protection Plan
Number 503 ; THE BERTELSMANN, INC.
EMPLOYEE PROTECTION PLAN NUMBER
503,

          Defendants
_____/

No. C 09-01163 MMC

**ORDER DENYING PLAINTIFF'S MOTION
FOR JUDGMENT; GRANTING
DEFENDANTS' CROSS-MOTION FOR
JUDGMENT**

     Before the Court are cross-motions for judgment, filed, respectively, by plaintiff

Penny Bender ("Bender") and defendants Hartford Life Insurance Company and The

Bertelsmann Inc. Employee Protection Plan Number 503 (collectively, "Hartford"), each

brought pursuant to Rule 52 of the Federal Rules of Civil Procedure.[1]  Having read and

_____

     [1]  Bender's motion is styled a motion for summary judgment, or, in the alternative, a
motion for judgment pursuant to Rule 52 of the Federal Rules of Civil Procedure.  "Since a
court reviewing for an abuse of discretion must review the administrative record and make
something akin to a credibility determination about the plan administrator's decision to deny
benefits, the court should set forth findings of fact and conclusions of law pursuant to
Federal Rule of Civil Procedure 52[;] [a]ccordingly, cross-motions may be decided pursuant
to Rule 52 even where one or both parties has styled its motion as a motion for summary
judgment."  Burke v. Pitney Bowes Inc. Long Term Disability Plan, 640 F. Supp. 2d 1160,
1170 (N.D. Cal. 2009) (internal quotations and citations omitted).

considered the parties' respective submissions in support of and in opposition to the cross-motions,[2] the Court rules as follows.[3]

## BACKGROUND

Bender seeks relief under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq., claiming Hartford abused its discretion when it terminated her disability benefits.  Bender seeks damages pursuant to 29 U.S.C. § 1132(a)(1)(B).

## I.      The Disability Policy

Hartford issued a Group Insurance Policy to Bertelsmann, Inc., No. GLT-205145, effective January 1, 1993 (the "Plan").  (See H00039.)[4]  Bender, as a Customer Service Manager for Arvato Services, was covered by the Plan at all relevant times.  (See H00732-34.)  The Plan provides benefits for policy-holders who become "Totally Disabled," defined as follows:

> Total Disability or Totally Disabled means that:
> 1.  during the Elimination Period; and
> 2.  for the next 24 month(s), you are prevented by:
>          a)  accidental bodily injury;
>          b)  sickness;
>          c)  Mental Illness;
>          d)  Substance Abuse; or
>          e)  pregnancy,
>
> from performing the Essential Duties of Your Occupation . . . .
>
> After that, you must be so prevented from performing the Essential Duties of Any Occupation for which you are qualified by education, training, or experience.

(H00054.)  The Plan defines an "Essential Duty" as follows:

> Essential Duty means a duty that:
> 1.  is substantial, not incidental;
> 2.  is fundamental or inherent to the occupation; and

---

[2]  By order filed April 27, 2010, the Court granted Bender's motion to reopen discovery, continued the hearing on the motions, and provided the parties an opportunity to submit supplemental briefing, which the parties thereafter provided.

[3]  On July 26, 2010, the Court took the matter under submission and vacated the hearing scheduled for July 30, 2010.

[4]  Unless otherwise noted, citations herein are to the record attached as Exhibit 1 to Bender's motion.

3.  cannot be reasonably omitted or changed.

To be at work for the number of hours in your regularly schedule workweek is also an Essential Duty.

(H00051.)  Pursuant to the Plan, coverage begins at such time as a covered individual "become[s] Totally Disabled, and furnish[es] proof to [Hartford] that [said claimant] remain[s] Totally Disabled."  (See H00031; see also H00042 (providing "benefits become payable" when "you submit Proof of Loss satisfactory to us").)  Additionally, pursuant to the Plan, "written proof of [one's] Disability must be sent to [Hartford] within 90 days after the start of the period for which [Hartford] owe[s] payment" and, "[a]fter that, [Hartford] may require further written proof that [one is] still Disabled."  (See H00033.)

## II.    Bender's Disability Claims

### A.    Bender's Short Term Disability Claim

On June 17, 2003, Bender, then age forty-four, filed with Hartford a claim for short term disability benefits, claiming that, as of June 13, 2003, she could no longer work because she was "not able to concentrate or make decisions due to pain and fatigue," which she described as "[i]ntense."  (See H01967.)  In support of her claim, Bender submitted an Attending Physician Statement from Maria Umali, M.D. ("Dr. Umali") (See H01970.)  Dr. Umali diagnosed Bender with "fibromyalgil chronic fatigue syndrom," and checked a box to describe Bender's condition as involving "[s]evere limitation of functional capacity; incapable of minimal (sedentary) activity."  (See id.)  In support of said report, Dr. Umali noted Bender's subjective symptoms of "chronic joint/muscle aches/pains" and fatigue (see id.), and included a report from a cervical MRI taken in July 2002, which noted "mild to moderate degenerative changes" at C6-7 (see H01971).   According to Bender, Hartford granted Bender's short term disability claim on December 19, 2003.  (See Pl.s' Mem. at 4:6-7.)[5]

---

    [5]  Although the record includes no evidence of such approval, Hartford does not dispute Bender's assertion that she was awarded short term disability benefits.

1

**B.      Bender's Long Term Disability Claim**

2

**1.      Bender's Initial Claim**

3

On December 3, 2003, Bender filed a claim for long term disability benefits with

4

Hartford.  (See H01949.)  She again listed Dr. Umali as her physician, along with Kenneth

5

Nyman, M.D. ("Dr. Nyman"), a board-certified rheumatologist.  (See H00596; H01949-50.)

6

To assist it in analyzing Bender's claim, Hartford received a "Physical Demand Analysis"

7

from Bender's employer (see H00674-76), as well as medical records of Dr. Umali and

8

Dr. Nyman (see H00607-67; H00672-73, H00687-95), including a thoracic spine MRI report

9

dated December 15, 2003, which noted "[d]egenerative disk desiccation" (see H01955).

10

Dr. Umali's notes contained a diagnosis of fibromyalgia.  (See H00692.)  Dr. Nyman's notes

11

contained diagnoses of rheumatoid arthritis and fibromyalgia.  (See, e.g., H00613;

12

H00658.)  Dr. Nyman refused, however, to complete an attending physician statement.

13

(See H00711.)

14

Hartford referred Bender's claim to Cynthia French, R.N. ("French") for review.

15

(See H00604.)  French noted Dr. Nyman's  "formal Dx" of "[i]nflammatory

16

[p]olyarthropathy," a general inflammation of five or more joints.  (See id.)  French also

17

noted that "Dr. Umali appear[ed] to be in agreement" with Dr. Nyman's diagnoses.

18

(See H00605.)  French reported: "it appears [Bender] does have RA [rheumatoid arthritis]

19

and [f]ibromyalgia," but "[t]here is very little objective clinical documentation . . . concerning

20

an acute exacerbation of RA in the Bil[ateral] hands, wrists or fingers that would explain

21

why [Bender] can no longer type or keyboard."  (See H00605.)

22

On March 1, 2004, Hartford denied Bender's claim for long term disability benefits on

23

the ground that she did "not meet the policy definition of Disability."  (See H00597.)

24

Hartford provided a letter explaining its reasoning (see H0000597-601), in which it stated:

25

> Our review of the medical information provided does not provide sufficient
> information as to why you cannot perform the duties of your sedentary

26

> occupation.  Neither physician [h]as provided any clinical documentation
> concerning exacerbation of symptoms that would explain why you cannot

27

> sit or type.

28

(See H00600.)

4

1      On April 27, 2004, Bender appealed Hartford's denial (see H00594-95), submitting

2  to Hartford an April 8, 2004 letter from Dr. Nyman in which he opined:  "[Bender] has

3  ongoing positive ANA results, two positive bone scans and a positive rheumatoid factor

4  which all show evidence of an inflammatory arthritic process" (see H00596).  Dr. Nyman

5  further stated:  "[Bender] is unable to perform her job because of joint pain and fatigue," she

6  "is presently being treated for inflammatory polyarthropathy," and "[i]n addition to [Bender's]

7  joint pain, she has had increased bruising, hair loss, leukopenia and fatigue."  (See id.)  In

8  Dr. Nyman's opinion, Bender "would not be able to perform certain aspects of her job, i.e.

9  typing constantly and all repetitive movements."  (See id.)

10     Hartford requested a review of Bender's medical records be conducted by Jerome

11 Siegel, M.D. ("Dr. Siegel"), a board-certified doctor in Occupation and Internal Medicine

12 (See H00568; H00573.)  Dr. Siegel reviewed Bender's file and spoke with Dr. Nyman.  In a

13 letter to Hartford, dated June 21, 2004, Dr. Siegel stated:

14          I asked Dr. Nyman about [Dr. Nyman's April 8, 2004 letter] and [Dr.
            Nyman] indicates that letter was written to help support Ms. Bender's
15          application for disability at her request.  Upon further questioning,
            however, he points out that the bone scan results which he had alluded to
16          demonstrated patchy uptake in the interphalangeal joints bilaterally as well
            as the feet and ankles bilaterally. . . .  Upon further discussions of the x-rays
17          and MRI results[,] Dr. Nyman agreed that Ms. Bender's evaluation was
            most consistent with an early connective tissue disease with a myofascial
18          pain component, but there was no serious connective tissue disease with
            joint or bony destructive discharges. . . .  Dr. Nyman agreed that the
19          subjective complaints appeared to outweigh specific objective physical
            examination findings or laboratory abnormalities.  On the other hand, her
20          laboratory evaluations did support an early connective tissue disease
            although[ ] we discussed that these findings correlate poorly with one[']s
21          ability to perform activities of daily living, instrumental activities of daily
            living and work activities.
22
23 (See H00571.)  Dr. Siegel went on to opine:  "[Bender's] physical examination has

24 demonstrated trigger points consistent with fibromyalgia/myofascial pain syndrome," and

25 "[p]hysical restrictions would include . . . limited repetitive use of her upper extremities on a

26 continuing basis," but, "the medical records and my discussion with Dr. Nyman supports

27 that Ms. Bender should have been physically capable of performing sedentary to light duty

28 work on or about 6/12/03 despite her ongoing subjective complaints."  (See H00573.)

5

1        Dr. Siegel further memorialized his conversation with Dr. Nyman in a letter he sent to

2   Dr. Nyman to review.  (See H00574-76.)  Consistent with his letter to Hartford, Dr. Siegel,

3   in his letter to Dr. Nyman, stated:  "[Y]ou and I agreed that Ms. Bender should have been

4   physically capable of sedentary to light duty work activities with physical restrictions

5   . . . [and] there is nothing on her physical examination, laboratory studies or imaging

6   studies which indicate that she has a serious disease process which would impair her from

7   performing work activities within the physical restrictions."  (See H00575.)  Dr. Nyman

8   signed the letter on June 22, 2004, modifying it to note that Bender's bone scans from

9   September 23, 2003 and March 8, 2004 were abnormal and to remove the indication that

10  the scans "failed to identify significant inflammatory or destructive process," and also to

11  note that he had "directly discussed [Bender's] work duties with her," but otherwise leaving

12  the letter, and, in particular, the description of Bender's capabilities, as it was written by Dr.

13  Siegel.  (See H00564-65.)

14        On June 28, 2004, Hartford notified Bender that it had reversed its earlier decision,

15  and was now finding Bender "Disabled in accordance with the provisions of [the Plan]."

16  (See H00560.)  Hartford's notes reflect the basis for its decision was that, "fingering

17  requirements [for Bender's job] are frequent to constant" and, "[g]iven the restriction of

18  limited repetitive use of the upper extremities, [Bender] [was] not capable of performing her

19  own occupation as a customer service manager."  (See Tubbs Decl. Ex. B, at FN 85

20  (Hartford's file notes).)

21        On July 20, 2004, Hartford sent Bender a letter stating her long term disability claim

22  had was now approved and requesting she apply for Social Security Disability Benefits.

23  (See H00552-53.)  On November 21, 2004, the Social Security Administration ("SSA")

24  notified Bender that it had found Bender was disabled as of June 12, 2003 and was entitled

25  to Social Security Disability Benefits beginning December 2003.  (See H01749-52.)  On

26  November 30, 2004, Bender's husband notified Hartford of the SSA's decision (see

27  H01748-52), and Hartford began deducting Bender's Social Security benefits from her Plan

28  benefits shortly thereafter (see H00836).

1                        **2.      Hartford's Review of Bender's Claim**

2          In April 2005, Dr. Nyman referred Bender to Robert Freundlich, M.D.

3   ("Dr. Freundlich"), a board-certified doctor of psychiatry and neurology, to evaluate

4   Bender's complaints of "twitching."  (See H00415.)  In a letter to Dr. Nyman, dated April 12,

5   2005, Dr. Freundlich stated Bender "has fibromyalgia" (see id.); Dr. Freundlich reported the

6   results of various neurological examinations, finding "[w]eakness in all four extremities (pain

7   limited)" (see H00418.  In an April 26, 2005 follow-up letter to Dr. Nyman, Dr. Freundlich

8   stated: "Review of [Bender's] medical records does not reveal evidence of an ominous

9   malignant neurological process[;] [t]he magnetic image of the cervical and thoracic spine

10  would not cause the symptomology [Bender] described on 4/12/05 and are typical for age."

11  (See H00413-14.)[6]

12         At some point thereafter, Hartford received a three-page excerpt of a thirty-five page

13  report, dated June 10, 2005, by Allen I. Salick, M.D. ("Dr. Salick"), a board-certified

14  specialist in rheumatology and a Qualified Medical Examiner.  (See H00406-08.)  Dr. Salick

15  was never listed by Bender as one of her treating physicians, and his report appears to

16  have been prepared in support of a worker's compensation claim filed by Bender.  (See

17  H00408 (discussing California worker's compensation law).)  In the report, Dr. Salick

18  concluded Bender suffered from fibromyalgia, not rheumatoid arthritis (see H00407) and

19  that Bender was "totally disabled" (see id.).  On September 13, 2005, Hartford wrote to

20  Dr. Nyman and asked whether he was in agreement with Dr. Salick's findings; Dr. Nyman

21  stated he was.  (See H00401.)

22         Hartford next requested James Bress, M.D. ("Dr. Bress"), a board-certified specialist

23  in internal medicine (see H00390), conduct a review of Bender's medical records.

24  Dr. Bress recorded his findings in a letter to Hartford, dated October 31, 2005.  (See

25  H00386-89.)  In regard to Dr. Salick's letter, Dr. Bress noted that Dr. Salick "[did] not think

26  [Bender] ha[d] carpal tunnel connective tissue disease," that "[Dr. Salick] felt she had a

27  ────────────────

28         [6]  It is unclear when Hartford received copies of Dr. Freundlich's April 12 and April
    26, 2005 letters; they are, however, included in Hartford's file.

false/positive rheumatoid factor," and that while "[Dr. Salick] did state he thought [Bender] was permanently disabled[,] [t]here was no examination, no history and no explanation to support the disability recommendation."  (See H00388.)  Additionally, Dr. Bress described a conversation he had with Dr. Nyman as follows:

> In discussing [Bender's] work capacity, [Dr. Nyman] felt that his opinion [as expressed in Dr. Siegel's letter] last year was valid now, that she could do sedentary to light work with a maximum lifting of 10 pounds on a full-time basis" and "[Dr. Nyman] did not specifically restrict use of the fingers.

(See H00389.)  Dr. Bress, noting "there were no objective findings to support symptoms of pain," concluded "[Bender] is capable of full-time sedentary to light work lifting no more than 10 pounds on an occasional basis with periodic change of position allowed."  (See id.)  Dr. Bress also sent a letter to Dr. Nyman, memorializing his conversation with Dr. Nyman, and stating:

> We discussed your opinion last year in discussion with The Hartford reviewer, and you felt your opinions had not changed since then, essentially that she could function at the sedentary to light occupation level on a full-time basis lifting no more than 10 pounds on an occasional basis, and that she should be allowed to change positions because she sometimes stiffens up and gets pain after sitting for prolonged periods.

(See H00393.)  Dr. Nyman signed the letter on November 1, 2005 without alteration, and faxed it to Hartford.  (See H00393-94.)

On December 22, 2005, Hartford wrote Bender and informed her that she did "not meet the policy definition of Disability beyond December 19, 2005" (see H01665), as she was "able to perform the Essential Duties of [Her] Occupation and no longer remain[ed] Disabled" (see H01667).  Hartford further explained that in so concluding, it had relied upon Dr. Nyman's agreement with Dr. Bress's letter, in which Dr. Nyman was in accord that Bender would be "able to perform sedentary to light work on a full-time basis."  (See H01667.)

On December 27, 2005, Bender again appealed Hartford's denial of benefits (see H01656), attaching a December 5, 2005 letter from Dr. Nyman in which Dr. Nyman stated:

> I am not trained in making disability evaluations as to the actual nature of

1
2
3

the disability, or as to how much a person can lift or carry, or how long they can stand or walk. . . .  Once again, I refer to the report of Alan A. Salick[,] who is a qualified medical evaluator.  [Bender] has been declared totally disabled.  I strongly feel that you should respect the opinion of a qualified medical evaluator.

4   (See H01662.)  Dr. Nyman went on to state that his "ability to treat [his] patient [was] being

5   interfered with by putting [him] in the middle of disability status statements" and that he

6   would "not be involved in disability status statements or reports."  (See id.)

7   In response to Bender's appeal, Hartford asked Behzad Emad, M.D. ("Dr. Emad"), a

8   board-certified specialist in pain medicine, to complete an "independent medical

9   evaluation," and on March 14, 2006, Dr. Emad examined Bender.  (See H01625)  In his

10  report to Hartford, Dr. Emad noted that Bender had "symptoms of neck pain radiating to the

11  shoulder, arm and hand," "symptoms of low back pain," "symptoms of bilateral knee pain,"

12  and "difficulty with prolonged communication such as writing and typing."  (See H01625-

13  26.)  Dr. Emad concluded Bender had fibromyalgia (see H001629), but disagreed with Dr.

14  Salick's opinion that Bender was disabled and instead agreed with Dr. Siegel and Dr.

15  Nyman that she could perform "sedentary to light duty work with physical restrictions" (see

16  id.).  Dr. Emad further concluded, however, that such work "should not require repeated or

17  prolonged desk work" or "prolonged twisting, griping, grasping, pinching, writing or

18  keyboarding" and that while Bender could work for "up to 6 hours per day," she would "not

19  be able to work 8-hour days."  (See H01630-31.)

20  On April 7, 2006, Hartford overturned its decision and reinstated Bender's disability

21  benefits.  (See H01617.)  Hartford's letter to Bender stated:

22
23
24
25
26

Our appeal investigation indicates that you have certain physical restrictions which prevent you from performing the duties of your Own Occupation of Customer Service Manager.  However[,] in order to continue receiving [Long Term Disability] benefits, you must be prevented by your condition from performing the duties of Any Occupation as defined in [the Plan].  An employability analysis will be conducted by The Hartford's vocational rehabilitation staff to determine whether you meet the policy definition of Disability from Any Occupation . . . .

27  (See H01617; see also Tubbs Decl. Ex. B, at FN 060 (noting "[b]ecause prior TC

28  termination was based on determination that [Bender] [was] capable of performing her

1 [own occupation], the basis for termination was not correct").)

2    On April 24, 2006, Joan F. Antezak ("Antezak"), a "Vocational Rehabilitation

3 Counselor," completed an "Employment Analysis Report," based largely on Dr. Emad's

4 conclusions, and found Bender "[did] not have transferable skills and [was] not employable

5 in a work capacity at [that] time."  (See H00306-08.)

6         **3.    Hartford's Video Surveillance and Termination of Benefits**

7    On January 17, 2007, Bender submitted to Hartford an "Attending Physician's

8 Statement of Continued Disability," filled out by Bender[7] (see H00272, H00277), attaching

9 thereto Dr. Nyman's notes from October 2006 to January 2007 (see H00278-81) as well as

10 a lumbar spine MRI report noting "disk desiccation" at LA-L5 and L5-S, but "[n]o significant

11 facet arthropathy" (see H00283).  On January 31, 2007, Bender completed a "Claimant

12 Questionnaire" for Hartford (see H00267-71), in which Bender described her physical

13 condition:

> Due to pain and fatigue, must lay down 4-5 times throughout the day for various lengths of time.  Cannot write or type more than 2-3 minutes.
14
15 > Cannot grasp longer than 1-2 minutes.  Cannot sit or stand longer than 10 minutes.
16

17 (See H00267.)  Bender also stated she had "[i]ncreased difficulty with motor skills," that

18 upon arising, "[w]ithin 1-2 hours [she was] able to dress," but only "slip on, no buttons or

19 snaps," and that she required "the use of equipment or adaptive devices" to bathe and

20 maintain personal hygiene.  (See id.)  Bender identified the physicians with whom she had

21 consulted in the past 18 months as Dr. Nyman and Dr. Umali.  (See H00268.)

22    In February 2007, Hartford ordered surveillance of Bender to verify Bender's

23 description of her disability in the Claimant Questionnaire.  (See H00135.)  Surveillance

24 was carried out from February 23 to February 25, 2007, and again on March 20 and March

25 21, 2007.  (See id., H00138, H00152.)  During the approximately three hours of

26 surveillance that were conducted on February 23, 2007, no activity was recorded at

27 ─────────────

28    [7] Bender explained that she filled out the "Attending Physician's statement" because Dr. Nyman refuses to fill out such paperwork.  (See H00272-73.)

1    Bender's address.  (See H00138.)  During the remaining days, however, Bender was

2    observed engaging in various activities she had represented in the Questionnaire she could

3    not do, including carrying and manipulating items, opening and closing car doors, driving,

4    eating, shopping, walking, and bending at the waist.  (See, e.g., H00140, H 00142,

5    H00155, H00157, H00159.)

6         In particular, Bender was observed on February 24 for approximately a half-hour,

7    from 10:39 a.m. to 11:06 a.m., both outside her home and at a local Starbucks (see

8    H00139-41); she was observed walking, bending at the waist, entering and exiting her car,

9    driving, and carrying and manipulating objects with her hands (see id.).  On February 25,

10   Bender was observed for approximately three and a half hours, from 8:11 a.m. to 11:45

11   a.m.; the video shows Bender wearing what appears to be jeans and a zip-up sweater.

12   (See H00142-48; Pl.'s Mem. Ex. 2.)[8]  During that time, Bender was observed attending a

13   flea market with her husband, at which she stood, squatted, bent, assisted her child in

14   trying on clothing, and walked about the market for approximately thirty-seven minutes

15   without a break; additional Bender was observed balancing on a stool for an indeterminate

16   amount of time, with one leg over the other (see H00142-46), and was again observed

17   driving and carrying objects in her hands, as well as putting on gloves (see id.).  After she

18   returned to her home, she was observed carrying large potted plants from the vehicle to

19   locations in her yard, and standing or walking for approximately fifty minutes, again, without

20   a break.  (See H00146-47.)  On March 20, Bender was observed for approximately five

21   hours, from 8:21 a.m. to 8:42 a.m. and from 1:48 p.m. to 4:31 pm.  (See H00155-60.)

22   Bender was observed driving for approximately fifteen minutes (see H00157-58), walking or

23   standing while shopping for periods of up to approximately thirty-eight minutes (see

24   H000158), as well as manipulating objects such as bags, a cell phone, and keys

25   (see H00155-60).  On March 21, Bender was observed for approximately four and a half

26   hours, from 8:05 a.m. to 8:35 a.m. and from 12:27 p.m. to 4:11 p.m.  (See H00160-66.)

27   _____

28        [8]   The Court has reviewed the video surveillance submitted by Bender.  (See Pl.'s
     Mem. Ex. 2.)

1   Bender was observed driving, with children in the vehicle, for uninterrupted periods of up to

2   approximately twenty-nine minutes (see H00160-61), shopping for a period of

3   approximately one hour and thirteen minutes (see H00162), and carrying objects such as

4   plastic bags, her purse, and what the surveillance report described as "medium-sized"

5   boxes (see, e.g., H00165).  The video reflects no outward signs of pain or limitation.

6          In addition to surveillance, Hartford, on April 24, 2007, conducted an in-person

7   "Continuing Disability Statement Interview" with Bender.  (See H00233.)  In summarizing

8   the interview, Hartford's representative noted, "Bender wrote that she [cannot] sit for more

9   than 10 minutes; yet, she sat continuously for 45 minutes in my presence."  (See H00236.)

10  At the interview, Bender provided Hartford with a copy of a March 16, 2007 "Forensic

11  Vocational Evaluation" conducted by Aida Y. Worthington ("Worthington") as part of

12  Bender's workers compensation claim (see H00233; H00188-203), in which Worthington,

13  relying primarily on the report by Dr. Salick (see H00199), stated Bender was "unable to

14  compete in the open labor market and return to Suitable Gainful Employment"

15  (see H00199).

16         On April  26, 2007, Hartford requested additional medical records from Dr. Nyman

17  (see H00258), and, on May 1, 2007, from Dr. Freundlich (see H00249).   Dr. Nyman sent

18  Hartford his medical notes (see H00259-60), and Dr. Freundlich sent Hartford a letter he

19  had written to Dr. Nyman on March 8, 2007, in which Dr. Freundlich discussed the results

20  of a neurological consultation from that same day (see H00252-257); in his letter,

21  Dr. Freundlich reported the results of the "[m]otor [e]xamination" he conducted, noting a

22  "[d]ecreased" ability for "[r]apid movements" and "[s]trength" in the "[r]ight upper extremity"

23  but in all other respects, for both upper and lower extremities, noting Bender's motor skills

24  and strength were normal.  (See H00254.)  Dr. Freundlich concluded Bender suffered from

25  "[p]robable radial neuropathy," "[p]ossible brachial plexopathy," and "[p]robable

26

27

28

1    compression." (See H00256.)[9]

2         On June 14, 2007, Hartford wrote Drs. Umali, Nyman, and Freundlich, enclosing

3    information related to Bender's surveillance,[10] informing them of Hartford's conclusion,

4    derived therefrom, that "[p]ain does not appear to have limited [Bender] from routine daily

5    activities, shopping or recreational pursuits," and requesting the doctors inform Hartford if

6    they did not agree that Bender could return to work full-time in a sedentary capacity.  (See

7    H00224-25, H00227-28, H00230-31.)  On June 25, 2007, having received no response,

8    Hartford followed up on its June 14, 2007 letter, again requesting comment from Drs.

9    Umali, Nyman, and Freundlich (see H00216-18), but did not receive a response from any of

10   them (see H00066).

11        Thereafter, Hartford requested a review of Bender's medical file and surveillance

12   videos by Reed Review Services.  (See H00097.)  Dayton Dennis Payne, M.D.

13   ("Dr. Payne"), a board-certified doctor of internal medicine and rheumatology (see H00104)

14   and Bruce LeForce, M.D. ("Dr. LeForce"), a board-certified doctor of neurology

15   (see H00107), conducted the review.

16        As part of his review, Dr. Payne spoke with Drs. Nyman, Freundlich and Umali.

17   (See H00101.)  Dr. Payne reported that Dr. Nyman refused to comment on Bender's

18   disability, that Dr. Freundlich stated "Bender [had] a probable brachial plexopathy" but that

19   there was an "apparent resolution of her symptoms he had evaluated," and that Dr. Umali

20   stated Bender "was probably unable to perform any work," but that Dr. Umali also stated

21   "she saw Bender only sporadically and essentially was giving the care of her problems to

22   Dr. Nyman."  (See id.)  In their July 23, 2007 reports to Hartford, both Dr. Payne and Dr.

23   LeForce concluded Bender was not disabled.  (See H00103 (stating Bender "would be

24

25        [9]  Dr. Freundlich's letter also contains a statement that Bender was "disabled due to
     her multiple rheumatological disorders"; the statement, however, is in a section describing
26   Bender's "[m]ental [s]tatus," and appears to have been included as background rather than
     as a conclusion based on Dr. Freundlich's examination.  (See H00253; H00256.)

27        [10]  The record is not clear as to whether the doctors were provided with the
28   surveillance video itself, the report of the surveillance, and/or a summary or other
     document describing the surveillance results.

                                            13

1   expected to be capable of unrestricted work"), H00107 (stating Bender was "capable of full-

2   time work").)

3       On August 2, 2007, based on the reports of Drs. Payne and LeForce, Antezak

4   completed a revised Employment Analysis Report on behalf of Hartford, and concluded

5   Bender had "transferable skills and [was] currently capable of performing full-time

6   sedentary work including her own occupation of Manager, Customer Technical Services

7   and a prior occupation of Office Manager." (See H00068-70.)

8       On August 17, 2007, Hartford wrote Bender, informing her that it was again

9   terminating her disability benefits and stating that, beyond August 16, 2007, she did not

10  meet the definition of "Disability" under the Plan. (See H00063-67.)   As set forth in the

11  letter, Hartford based its decision on Bender's medical file, including Bender's application;

12  medical records from Drs. Nyman, Freundlich, and Umali; Bender's January 31, 2007

13  Claimant Questionnaire; the April 24, 2007 in-person interview; the surveillance video; the

14  reports of Drs. LeForce and Payne; and the August 2, 2007 Employment Analysis Report.

15  (See H00064-66.)

16      On February 8, 2007 Bender again appealed Hartford's denial, submitting a fifteen-

17  page letter, typed by Bender's daughter, and approximately 150 pages of medical records,

18  including Dr. Salick's full report, as well as supporting letters from Bender's neighbor and

19  mother. (See H01065-1215.)   Bender recounted her medical conditions and treatment

20  (see H01066-074) and countered representations by Worthington regarding her April 24,

21  2007 interview (see H01074).   In particular, Bender asserted that her husband assisted

22  her in completing paperwork at the interview and that, contrary to Worthington's

23  representation, she did not remain seated for 45 minutes, but, rather, had to stand three to

24  four times for "a few minutes." (See id.)   Bender also stated, in response to Hartford's

25  description of the video surveillance in its letter, that the surveillance was misleading

26  because the "videos show [her] coming and going for short periods on different days," she

27  occasionally picks her godson up at school or goes shopping, and the boxes she was

28  observed carrying were empty. (See H01075.)   With regard to the video of her day at the

14

1    flea market and her carrying potted plants, Bender stated she had "double dose[d]" on anti-

2    inflammatory drugs in order to spend the day with her husband, who enjoys going to the

3    flea market on Sundays, but that she could not be "'almost normal' every Sunday." (See

4    H01075.)  Bender also submitted a lumbar spine MRI report from January 17, 2008, which

5    noted "disc dehydration" at L4-L5 and L5-S1 (see H01140-41), as well as a February 5,

6    2008 letter from her new rheumatologist, Yoon Min, M.D. ("Dr. Min"), a physician board-

7    certified in rheumatology and internal medicine (see H01206-07, H01212).  Dr. Min

8    expressed his opinion that Bender had an "autoimmune process," such as "systematic

9    lupus erythematosus (SLE) or undifferentiated connective tissue disease (UCTD) of at least

10   moderate degree," but did not think Bender had rheumatoid arthritis.  (See H01206.)

11          On March 12, 2008, at Hartford's request, Dr. Min prescribed a Functional Capacity

12   Evaluation ("FCE") for Bender (see H01059), which was conducted on April 7, 2008 by

13   Jonathan Riddick ("Riddick"), an occupational therapist (see H01005).  According to

14   Riddick, Bender complained of pain, and "voluntarily terminated the frequent knuckle to

15   shoulder lifts and frequent floor to shoulder lifts due to complaints of low back, upper back

16   and bilateral leg pain," but that Bender "did not have the appropriate physiological

17   responses (heart rate increases) and revealed 13 out of 28 consistencies with isometric

18   testing indicating an inconsistent effort" such that "her true physical capability [was] unable

19   to be determined." (See H01005.)   Riddick further reported, having reviewed the

20   surveillance videos, that Bender "demonstrated inconsistencies in her gait pattern during

21   the FCE vs. the two video surveillance tapes that were provided," and "[d]uring the FCE

22   she demonstrated decreased cadence (slow gait pattern), increased stance time on right

23   lower extremity and Trendelenberg on the right side" but "[n]o noted deviations in her gait

24   patter were observed during the video surveillance." (See H01030.)  Riddick concluded

25   Bender was capable of working "an 8-hour work day for a 40 hour work week" in a "light"

26   occupation.  (See H01005.)

27          On April 30, 2008, Hartford wrote Bender and informed her it was upholding its prior

28   decision to terminate her disability benefits.  (See H00784-93.)  Hartford concluded the

15

1  "weight of evidence fail[ed] to document a condition of such severity to preclude all work

2  levels" and that Bender "maintain[ed] the functional capacity to perform work activities up to

3  the light physical demand level."  (See H00792.)

4       Thereafter, Bender filed the instant action.

5                        **LEGAL STANDARD**

6       The standard of review applicable to a plan administrator's denial of ERISA benefits

7  is dependent upon the terms of the benefit plan.  Firestone Tire & Rubber Co. v. Bruch, 489

8  U.S. 101, 115 (1989).  If "the benefit plan gives the administrator or fiduciary discretionary

9  authority to determine eligibility for benefits or to construe the terms of the plan," an abuse

10  of discretion standard is applied; otherwise, the denial is reviewed de novo.  Id.  Here, the

11  parties agree the benefit plan provides Hartford discretionary authority, and consequently,

12  an abuse of discretion standard is applicable.[11]

13       An "inherent conflict" of interest exists, however, where, as here, "a plan

14  administrator both administers the plan and funds it."  Abatie v. Alta Health & Life Ins. Co.,

15  458 F.3d 955, 967 (9th Cir. 2006).  "[I]f a benefit plan gives discretion to an administrator or

16  fiduciary who is operating under a conflict of interest, that conflict must be weighed as a

17  factor in determining whether there is an abuse of discretion."  Firestone, 489 U.S. at 115

18  (internal quotes omitted).  An inherent, or "structural," conflict, "should prove more

19  important (perhaps of great importance) where circumstances suggest a higher likelihood

20  that it affected the benefits decision, including, but not limited to, cases where an insurance

21  company administrator has a history of biased claims administration," and "should prove

22  less important (perhaps to the vanishing point) where the administrator has taken active

23  steps to reduce potential bias and to promote accuracy, for example, by walling off claims

24  administrators from those interested in firm finances, or by imposing management checks

25  that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits."

26

27       [11]  The Plan expressly provides that Hartford has "full discretion and authority to
28  determine eligibility for benefits and to construe and interpret all terms and provisions of"
    the Plan.  (See H00051.)

See Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105, 117 (2008).  As the Ninth

Circuit observed in Abatie:

> The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history.  A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial; fails adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly denied benefits to deserving participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

Abatie, 458 F.3d at 968-69 (internal citations omitted).

Here, Hartford contends the Court should apply a low level of skepticism to Hartford's decision.  Hartford notes that Bender identifies no evidence weighing in favor of a high level of skepticism, and, has submitted a declaration from Bruce Luddy ("Luddy"), Hartford's "Director of Litigation and Appeals," to show Hartford, at the time of the events at issue here, walled off its claims administrators and imposed management checks for purposes of penalizing inaccurate decisionmaking.  (See Luddy Decl. ¶ 1, Mar. 26, 2010.)  Luddy states that, as of the time of his declaration, he had held that position for four years,[12] that he is "responsible for supervising the claims staff who decide appeals of denied disability benefit claims" and that he is "fully familiar with the policies and procedures Hartford employed from 2003 through 2008 when [Bender's] claim was being evaluated."  (See id.)[13]

In particular, Luddy states that each disability claim Hartford evaluates "is analyzed individually and without consideration of other claims, any set reserve amount, the cost to

---

[12]  Luddy states that prior to his current position, he was, beginning in 1998, the Assistant Director of Litigation and Appeals.  (See id.)

[13]  Bender initially objected to the admission of Luddy's declaration on the ground that Luddy was not disclosed as a witness pursuant to Rule 26 of the Federal Rules of Civil Procedure and that Luddy did not properly disclose the sources of his knowledge.  (See Pl.'s Opp. at 13-15.)  The Court, thereafter provided Bender the opportunity to reopen discovery and depose Luddy, after which Bender filed supplemental briefing addressing the merits of Luddy's declaration but not its admissibility.  In any event, to the extent Bender has not withdrawn her initial objection, the objection is hereby overruled. Additionally, Bender's request to conduct further discovery "regarding the bias and integrity of Hartford's claims practices" (see Pl.'s Supp. Opp. and Reply at 6:19-21) is hereby denied.

17

Hartford to approve or deny a claim, and the reviewing employee's future employment or role within Hartford" and "[o]n appeal, each claim is independently analyzed by an examiner in the appeals unit who had no role or input in the initial investigation and termination of the claim."  (See id. ¶ 3.)  Luddy further states that "Hartford employees who review claims do not receive bonuses based on the numbers of claims they deny" (see id. ¶ 4); "Hartford employees who review claims do not have access to or knowledge of financial information regarding a policyholder, nor is the information regarding the profitability or other financial information of a policyholder provided or accessible to them" (see id. ¶ 5); "Hartford employees who review claims are walled off from those interested in firm finances" (see id. ¶ 6); and "[t]he subject of claims approved versus claims denied is never raised during annual reviews, and it does not affect, nor is it considered in, employee reviews of compensation decisions" (see id. ¶ 7.)

Bender argues such evidence should be given little weight.  In support thereof, Bender identifies documents produced by Hartford in a separate case, Reese v. Hartford Life and Accident Ins. Co., No. C 08-8604 (C.D. Cal.), which Bender asserts contradict Luddy's declaration; specifically, Bender asserts said documents, which relate to two employees, show Hartford's employees are reviewed based on their ability to deny disability claims.  (See Pl.'s Opp. Ex. 2.)  As Hartford points out, however, the documents show one of the two employees, a "Rehabilitation Clinical Case Manager" (see id. at HAR 3340), did "not have any decision-making authority regarding whether a claimant is entitled to disability benefits or whether a claimant's disability benefits should be terminated" but, rather, her "role[ ] [was] limited to working with claimants who have potential to return to work and then identifying potential employers" (see Rolstad Decl. Ex. 6, at ¶ 5, April 14, 2010 (Polman Decl., Reese v. Hartford Life and Accident Ins. Co., No. 08-8604 (C.D. Cal.))).  The documents show the other employee, a Medical Case Manager in Hartford's "Special Investigations Unit" (see Pl.'s Opp. Ex. 2, at HAR 01676), was evaluated based on average Attending Physician "agreement decisions" (see id. at HAR 01677) and the exercise of "good judgment in vendor selection" (see id. at HAR 01678).  The record is silent, however,

1   as to the meaning of "agreement decisions" or upon what criteria "good judgment" was

2   determined.  In sum, the above-referenced documents do not contradict Luddy's

3   declaration.[14]

4       Lastly, in an effort to impeach Luddy's declaration, Bender relies on deposition

5   testimony given by Luddy in the instant case.[15]  In particular, Bender identifies testimony

6   indicating that Hartford's claims administrators are "in general aware of the profitability of

7   [Hartford's] group benefits division from time to time" as a result of Hartford's publicly

8   available quarterly earnings releases (see Baum Decl. Ex. A, at 58:3-10 (Luddy Depo. Tr.));

9   that claims administrators have access to raw data reflecting the number of claims Hartford

10  approves or denies, although not in "any meaningful form" (see id. at 29:10-21, 47:10-49:4);

11  that claims administrators are trained that denial of claims "that shouldn't be paid" helps plan

12  members because paying such claims "would have an impact on premiums" (see id. 30:23-

13  31:8); and that, although claims administrators "don't interact" with Hartford employees

14  "interested in financial operations" in "the course of their day-to-day duties," claims

15  administrators may interact with other Hartford employees in "the course of their social

16  interaction" (see id. 86:12-87:18).  Such testimony, however, does not contradict Luddy's

17  declaration, nor does it show Hartford has not taken measures to "reduce potential bias and

18  to promote accuracy."  See Metropolitan Life, 554 U.S. at 117.

19      The Court finds Luddy's declaration demonstrates the steps Hartford has taken to

20

21      [14]  Bender also seeks to introduce "Pain Claim Guidelines" and "UDC 5/24/06 Audit
22  Results," which, according to Bender's counsel, "were produced by [ ] Hartford in another
    federal court case."  (See Baum Decl. ¶¶ 5, 6, June 11, 2010.)  Hartford objects to their
23  admission on the ground that, inter alia, Bender fails to properly authenticate the
    documents.  Hartford's objection is well-taken.  See Orr v. Bank of America, NT & SA, 285
24  F.3d 764, 777 (9th Cir. 2002) (finding document is not authenticated by its having been
    produced in discovery in separate litigation).  In any event, like the documents discussed
25  above, these documents would require further foundation before their relevance could be
    assessed.

26      [15]  By order filed April 27, 2010, the Court granted Bender's motion to re-open
27  discovery and allowed Bender to depose Luddy, "such deposition being limited to Luddy's
    knowledge of the active steps taken by Hartford to reduce potential bias and to promote
28  accuracy in Hartford's claims administration, as described in Luddy's declaration."
    (See Order Granting Mot. to Re-Open Discovery at 2:6-8.)

1   reduce bias and promote accuracy.  The Court further finds, however, such procedures do

2   not serve to wholly eliminate the existence of conflict.  Cf. Edwards v. AT&T Disability

3   Income Plan, No. C 07-4573 PJH, 2009 WL 650255, at *11, *13 (N.D. Cal. 2009) (finding

4   "no evidence in the record of a conflict of interest" where, although "AT&T is both the

5   funding source and the Plan Administrator, the Plan requires AT&T to appoint a Claims

6   Administrator, and also vests absolute discretion in the Claims Administrator to grant or

7   deny claims under the Plan" (internal quotations omitted).)

8        Accordingly, the Court will apply an abuse of discretion review tempered by a modest

9   degree of skepticism.

10                                       **DISCUSSION**

11        When reviewing for abuse of discretion, the Court "cannot substitute [its] judgment for

12   the administrator's . . . [and] can set aside the administrator's discretionary determination

13   only when it is arbitrary and capricious."  Jordan v. Northrop Grumman Welfare Benefit Plan,

14   370 F.3d 869, 875 (9th Cir. 2004), overruled on other grounds by Abatie, 458 F.3d at 969.

15   "An ERISA administrator abuses its discretion only if it (1) renders a decision without

16   explanation, (2) construes provisions of the plan in a way that conflicts with the plain

17   language of the plan or (3) relies on clearly erroneous findings of fact."  Boyd v. Bert

18   Bell/Pete Rozelle N.F.L. Ret. Plan, 410 F.3d 1173, 1178 (9th Cir.2005).  Here, Bender

19   argues, Hartford abused its discretion when it terminated her benefits on August 17, 2007,

20   and upheld that decision on April 30, 2008, by, according to Bender, relying on physicians'

21   opinions that "are extremely selective in the facts they focus on and suffer from a complete

22   lack of medical, scientific and logical analysis" (see Pl.'s Mem. at 14:13-15) and by ignoring

23   "ample evidence in the record to demonstrate that [Bender] has been continuously disabled

24   since 2003" (see Pl.'s Opp. at 1:5-7).

25        To determine whether an administrator abused its discretion in denying benefits,

26   courts consider a number of factors, including: (1) any "conflict of interest"; (2) the "quality

27   and quantity of the medical evidence"; (3) "whether the plan administrator subjected the

28   claimant to an in-person medical evaluation or relied instead on a paper review of the

1    claimant's existing medical records"; (4) "whether the administrator provided its independent

2    experts with all of the relevant evidence"; and (5) "whether the administrator considered a

3    contrary SSA disability determination."  See Montour v. Hartford Life & Acc. Insur. Co., 588

4    F.3d 623, 630 (9th Cir. 2009) (internal quotation and citation omitted).

5          Here, Hartford, as noted, had a "structural" conflict, albeit one it had taken steps to

6    ameliorate.  Also, the SSA had found Bender was disabled as of June 12, 2003  (see

7    H01749-52) and the record contains no evidence to show the SSA altered its determination

8    thereafter, a circumstance Hartford did not address in its in its denial letter.  As discussed

9    below, however, the remaining factors support a finding that Hartford did not abuse its

10   discretion.

11         With respect to the medical evidence, the Court first notes that the question raised by

12   Hartford in assessing Bender's claim for benefits, and in ultimately denying her claim, was

13   not whether Bender had a diagnosed medical condition, which diagnoses Hartford did not

14   question (see, e.g., H00063-67), but, rather, whether, as a result of such condition(s),

15   Bender's ability to function was impaired to such a degree that she qualified as "Totally

16   Disabled" under the Plan (see H00063, H00066-67); Jordan, 370 F.3d at 880 (holding fact

17   "[t]hat a person has a true medical diagnosis does not by itself establish disability").

18         In making that determination, Hartford considered the opinions of treating physicians,

19   examining physicians, and consulting physicians who reviewed Bender's medical file, as

20   well as the opinions of practitioners in related fields.  Over the course of its evaluation of

21   Bender's claim, it requested Bender submit to an in-person Independent Medical Evaluation

22   as well as a Functional Capacity Evaluation.  Although Hartford, in ultimately terminating

23   Bender's benefits, relied on opinions given by physicians who had not themselves examined

24   Bender, such reliance does not itself constitute an abuse of discretion.  See Corby v. Unum

25   Ins. Co. of America, No. C 09-5890 WHA, 2010 WL 3768040, at *5 (N.D. Cal. Sept. 21,

26   2010) (finding a "'pure paper' review by itself does not constitute an abuse of discretion").

27   Nor must a plan administrator "accord special deference to the opinions of treating

28   physicians."  See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 831 (2003).

1    Moreover, as set forth above, of the physicians who had examined or treated Bender

2    in more recent years, none offered an unqualified opinion that Bender was impaired to the

3    extent that she could not perform the essential duties of a sedentary position.[16]  In particular,

4    as noted, Dr. Payne spoke with Drs. Nyman, Freundlich and Umali in July 2007.

5    (See H00101.)[17]  Dr. Umali opined that Bender was "probably" disabled, and conceded she

6    "saw Bender only sporadically and essentially was giving the care of her problems to

7    Dr. Nyman."  (See id.)  Dr. Nyman, in turn, refused to express an opinion as to Bender's

8    disability.  (See id.)  Dr. Freundlich was of the opinion that there was an "apparent resolution

9    of [the] symptoms he had evaluated."  (See id.)

10    Even where, at an earlier time, those doctors had offered opinions that Bender was

11    disabled, such opinions were largely without support.  Dr. Freundlich's sole reference to

12    Bender's disability "due to her multiple rheumatological disorders" was made in a section of

13    his report describing Bender's "Mental Status," and was not included in his conclusions.

14    (See H00253, H00256.)  Dr. Umali's only determination of disability was recorded in

15    Bender's short term disability claim, and consisted of a single check mark on a form, without

16    elaboration.  (See H01970.)  Dr. Nyman's initial diagnosis of disability, on April 8, 2004,

17    consisted solely of his statement that Bender was "unable to perform her job because of

18    joint pain and fatigue," likewise without elaboration.  (See H00596.)

19    Indeed, Dr. Nyman's opinion appears to have changed throughout the relevant time

20    period, without explanation.  Although on September 13, 2005, stated he agreed with

21

22

23    [16]  It is undisputed that the position Bender held is properly classified as "sedentary."

24    [17]  Bender had not seen Dr. Min as of the time of the reviews by Drs. Payne and
LeForce. (See H01206.)  In any event, Dr. Min in his initial letter, did not opine as to
25    Bender's disability, except to note that he hoped Bender "[would] improve significantly in
the near future [and] that she [would] be able to go back to some type of occupation she
26    can perform at least part-time."  (See H01207.)  Although Bender also submits an October
31, 2008 letter from Dr. Min, that letter was sent to Hartford long after Hartford had
27    completed its review of Bender's disability claim and denied her appeal.  "[U]nder an abuse
of discretion standard," a court's "review is limited to the record before the plan
28    administrator . . . ." Jebian v. Hewlett–Packard Co. Employee Benefits Org. Income Prot.
Plan, 349 F.3d 1098, 1110 (9th Cir. 2003) (internal quotation and citation omitted).

Dr. Salick's determination of disability[18] (see H01662), Dr. Nyman previously agreed with Dr. Siegel that "Bender should have been physically capable of sedentary to light duty work activities with physical restrictions" (see H00564-65), and subsequently agreed with Dr. Bress, on November 1, 2005, that Bender "could function at the sedentary to light occupation level on a full-time basis (see H00393-94).[19]

Under the Plan, Bender at all times bore the burden of establishing she was disabled as defined therein.  (See H00033.)  In addition to any deficiencies in the evidence on which Bender relied, Hartford had before it significant evidence weighing against a finding that Bender was "Totally Disabled," specifically, the opinions of Drs. Payne and LeForce,[20] the FCE, and the video surveillance.  Although Drs. Payne and LeForce, on whose opinions Hartford primarily relied, did not themselves examine or treat Bender, they reviewed Bender's medical record[21] and, as noted, Dr. Payne, apparently on his own initiative, personally spoke with Bender's treating physicians.  Dr. Payne, a specialist in internal

---

[18]  Although Dr. Salick's June 10, 2005 conclusion that Bender was disabled was supported by his findings regarding Bender's physical limitations (see H01171-1205), Dr. Emad, who examined Bender in 2006, expressly disagreed with Dr. Salick's conclusion (see H01629), and Dr. Salick did not have the benefit of reviewing the surveillance videos of Bender, which were taken in 2007.

[19]  The University Disability Consortium ("UDC"), to which Dr. Bress belongs, has been criticized for its close relationship with insurance companies, including Hartford.  See, e.g., Velikanov v. Union Sec. Ins. Co., 626 F. Supp. 2d 1039, 1051 (C.D. Cal. 2009); Caplan v. CNA Fin. Corp., 544 F. Supp. 2d 984, 989-90 (N.D. Cal. 2008).  Any financial incentive that might impugn Dr. Bress's opinion, however, would not explain Dr. Nyman's concurrence with it.

[20]  Concededly, the reports submitted by Drs. Payne and LeForce are not lengthy in nature.  As noted above, however, the reports submitted by Drs. Nyman, Freundlich, and Umali, to the extent they included an opinion as to the question of disability, likewise were brief.

[21]  Bender argues it is "impossible to tell what medical records [Dr. Payne] reviewed." (See Pl.'s Opp. at 5:13.)  Dr. Payne, however, provided a long list of records he included in his review (see H00099-101), and Bender identifies no particular part of her medical record that was not provided to Dr. Payne.  Although there is some ambiguity with regard to the materials reviewed by Dr. LeForce, his review appears to have been limited to Bender's neurological condition, and he discusses the relevant evidence in the record related thereto: Dr. Freundlich's March 8, 2007 neurological examination.  (See H00107.)  Further, as with Dr. Payne, Bender identifies no particular part of her medical record not provided to Dr. LeForce.

1    medicine, did "not see any evidence of objective findings in this case that would be expected

2    to be producing restrictions or limitations on activities" (see H00103), and Dr. LeForce, a

3    specialist in clinical neurology, found "no objective findings to support impairment from a

4    neurological condition" (see H00107).[22]

5         The opinions of Drs. Payne and LeForce, and Hartford's ultimate decision, are

6    supported by the video surveillance.  The video surveillance of Bender demonstrates she

7    engaged in activities largely inconsistent with the limitations she reported in her January 31,

8    2007 Claimant Questionnaire, and, consequently, inconsistent with a finding of disability.  In

9    contrast to Bender's representation that she could not "sit or stand longer than 10 minutes"

10   (see H00267), Bender, over the course of four days, was observed sitting and walking

11   without apparent discomfort for periods of time exceeding the ten minutes Bender claimed

12   was her maximum capability (see, e.g., H00142-43 (recording of Bender walking around

13   flea market for approximately forty minutes), H00145-47 (recording of Bender moving about

14   yard for approximately thirty minutes), H00157 (recording of Bender shopping for

15   approximately thirty-five minutes), H00160-61 (recording of Bender driving/sitting in car for

16   approximately thirty minutes).)  At all times, Bender is shown ambulating normally, without

17   any visible signs of discomfort or limitation.  (See, e.g., H00155.)  In contrast to Bender's

18   statement that she "cannot grasp longer than 1-2 minutes" (see H00267), she can be seen

19   grasping, using, and manipulating items such as a cell phone (see H00157), plastic bags

20   (see, e.g., H00165), car doors (see, e.g., H00159) and a blanket (see H00145).  Indeed, at

21   one point, Bender is recorded carrying large potted plants without any observed difficulty.

22   (See H00146-47.)  Whatever "difficulty" Bender reportedly experienced as to "motor skills"

23

24        [22] Although Drs. Payne and LeForce refer to a lack of "objective findings," those
     references are to an absence of objective findings supporting a conclusion that Bender was
25   not able to work because of her diagnosed medical condition and do not refer to an
     absence of objective findings to support a diagnosis of the medical condition itself.  (See,
26   e.g., H00103, H00107.)  Compare Salaomaa v. Honda Long Term Disability Plan, No. 08-
     55426, 2011 WL 2040934, at *10 (9th Cir. Mar. 7, 2011) (finding plan's termination of
27   disability claim for fibromyalgia due to lack of objective evidence of condition was abuse of
     discretion) with Jordan, 370 F.3d at 877 (holding plan administrator did not abuse discretion
28   by requesting objective evidence that "the fibromyalgia [the claimant] suffered from
     disabled her from working at her job").

1    (see H00267), there is nothing in the video suggesting such difficulty in any manner

2    interfered with her ability to engage in  a wide variety of activities, including those implicating

3    safety concerns, such as transporting minor children in a vehicle (see Pl.'s Mem. Ex. 2).

4         Although Bender protests that the surveillance was misleading because the "videos

5    show [her] coming and going for short periods on different days" (see H01075), there is no

6    evidence in the record suggesting the video or surveillance records reflect cherry-picked

7    moments.  Bender was surveilled over the course of five days (see H00135, H0152), on

8    four of which she was recorded engaging in activities she had represented to Hartford, only

9    a short while before, she essentially could not do at all.  Further, the recordings for at least

10   three of those days show her engaging in lengthy, uninterrupted periods of activity (see

11   H00142-48 (recording of approximately three and a half hours of activity on February 25,

12   2007), H00156-60 (recording of approximately four hours of activity on March 20, 2008),

13   H00161-66 (recording of approximately four hours of activity on March 21, 2008), as to only

14   one of which did Bender offer an explanation (see H01075 (stating she was "double

15   dos[ing]" on pain medications)).  Nor is there any indication that Bender's engaging in

16   sustained activity on any given day resulted in a diminution in her ability to engage in

17   activities on a subsequent day.  (See H00155-60 (recording of activities on March 20,

18   2008)); H00160-66 (recording of activities on March 21, 2008).)  In sum, the videos provide

19   objective evidence to support the conclusion that Bender's pain "does not rise to the level of

20   disabling pain."  See Montour, 588 F.3d at 635.[23]

21        Moreover, as discussed, Hartford provided Drs. Umali, Nyman, and Freundlich an

22   opportunity to review the video surveillance and state whether they nonetheless continued

23   to believe Bender was disabled, and none of those doctors elected to do so (see H00066,

24   H00216-18), a decision tending to undermine their objectivity and any previous conclusions

25

26        [23]  Additionally, as noted, a Hartford representative reported activity by Bender at the
27   April 24, 2007 interview that was inconsistent with Bender's Claimant Questionnaire, and
     was consistent with the video surveillance.  (See H00236.)  Although Bender contested the
28   accuracy of that report (see H01074), Hartford was entitled to consider it and evaluate its
     reliability in the context of all of the evidence made available to Hartford.

they had offered regarding Bender's disability.  See Jordan, 370 F.3d at 877-78 (noting "the

failure of an employee's physician to respond to inquiries by the plan administrator

undermined evidence in the petitioner's favor").

Further, when considered together with Bender's self-reported limitations in the

Questionnaire, the surveillance video was sufficient to bring Bender's credibility seriously

into question, which, in cases such as Bender's where self-reported pain is at the heart of

the claim, further supports Hartford's decision.  See Finley v. Hartford Life and Acc. Ins. Co.,

400 F. App'x 198, 200-01 (9th Cir. 2010) (holding "[i]t was not an abuse of discretion for

Hartford to conclude that [the claimant] lacked credibility and therefore to discount the value

of her self-reported pain incidence, the heart of her claim and her doctor's assessments of

her health, and place more weight on the surveillance video").  Also bearing on Bender's

credibility was the FCE report,[24] which, while conceding Bender's "true physical capability

[was] unable to be determined," concluded such the failure was the result of Bender's

voluntary termination of tests due to complaints of pain that were inconsistent with her

measurable physiological reactions (see H01005), and also concluded her performance was

not consistent with her conduct as recorded in the surveillance videos (see H01030).

In sum, based on the evidence Hartford had before it in late 2007, it was not an

abuse of discretion for Hartford to terminate Bender's disability benefits.

---

[24] Bender argues the Functional Capacity Evaluation was a "new reason for denial" and in violation of ERISA procedure.  (See Pl.'s Opp. at 8 (citing Abatie, 458 F.3d at 974 ("When an administrator tacks on a new reason for denying benefits in a final decision, thereby precluding the plan participant from responding to that rationale for denial at the administrative level, the administrator violates ERISA's procedures.")).)  The Functional Capacity Evaluation does not represent a "new reason," however, but, rather, Hartford's consideration and review of new evidence, Dr. Min's letter, submitted by Bender on appeal for the purpose of contesting the reason on which Hartford had originally denied further benefits, specifically, that Bender submitted insufficient evidence to show she met the definition of disabled under the Plan.  (See H00063-67); cf. Abatie, 458 F.3d at 974 (finding, where plan administrator "originally denied [p]laintiff's claim for life insurance benefits because it concluded that no waiver of premium application had been submitted," but "in its final denial of [p]laintiff's claim . . . also added a second reason–that [p]laintiff had provided insufficient evidence to show that [the plaintiff] had remained totally disabled," plan administrator violated ERISA).

26

1

**CONCLUSION**

2          For the foregoing reasons, Hartford's Cross-Motion for Judgment is hereby

3     GRANTED and Bender's Motion for Judgment is hereby DENIED.

4          **IT IS SO ORDERED.**

5

6     Dated: August  12, 2011

                                    _____
7                                   MAXINE M. CHESNEY
                                    United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28